**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALISON VANDERMAY<br>3216 Lenape Dr.<br>Dresher, PA 19025 | : <br> : <br> : <br> : | CIVIL ACTION<br><br>CASE NO.: _____ |
| Plaintiff, | : <br> : | |
| v. | : <br> : | **JURY TRIAL DEMANDED** |
| WAWA, INC.<br>1393 W. Baltimore Pike<br>Media, PA 19063 | : <br> : <br> : <br> : | |
| Defendant. | : <br> : | |

## CIVIL ACTION COMPLAINT

Plaintiff, Alison Vandermay (hereinafter referred to as "Plaintiff" unless indicated otherwise), hereby complains and avers as follows against Wawa, Inc. (hereinafter "Defendant"):

## INTRODUCTION

1.    Plaintiff initiates the instant action to redress violations by Defendant of Title VII of the Civil Rights Act of 1964, ("Title VII" – 42 U.S.C. §§ 2000d *et. seq.*)/the Pregnancy Discrimination Act ("PDA"), the Pregnant Workers Fairness Act ("PWFA" - Pub. L. No. 117-328, 136 Stat. 4459 (2022)), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et. seq.*), and the Pennsylvania Human Relations Act ("PHRA").[1] As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.    This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims, because this civil action arises under a law of the United States.

---

[1] Plaintiff will move to amend her instant lawsuit to include claims under the PHRA once her administrative remedies are fully exhausted with the Pennsylvania Human Relations Commission. Any claims under the PHRA though would mirror her instant claims.

3.    This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny. This Court has supplemental jurisdiction over Plaintiff's future state-law claim(s) because such claim(s) arise out of the same common nucleus of operative facts as her federal claims asserted herein.

4.    Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district and Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a citizen of the Eastern District of Pennsylvania.

5.    Plaintiff is proceeding herein under the Title VII/PDA and the PWFA and has properly exhausted her administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## **PARTIES**

6.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.    Plaintiff is an adult individual, with an address as set forth in the caption.

8.    Defendant is an American chain of convenience stores and gas stations operating in Pennsylvania, New Jersey, Delaware, Maryland, Virginia, Washington, D.C., West Virginia, Florida, Alabama, North Carolina, Ohio, Georgia, Kentucky, and Indiana.

9.     Plaintiff physically worked out of Defendant's beverage processing plant, located in Media, PA.

10.     At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

11.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

12.     Plaintiff was hired by Defendant on or about July 19, 2021 as an SQF Practitioner.

### Plaintiff's Reporting Structure

13.     Throughout the majority of her employment with Defendant, Plaintiff reported to Senior Supervisor Quality Assurance (hereinafter "QA Senior Supervisor") – Stewart Duarte (hereinafter "Duarte") and Senior Manager of Quality Assurance (hereinafter "Senior Manager of QA") – Jeff Maiatico (hereinafter "Maiatico").

14.     Above Maiatico in Defendant's managerial hierarchy was Nancy Wilson (hereinafter "Wilson") – Defendant's Risk Management and Safety Director.

15.     In or about March of 2025, Maiatico retired and Amanda Douglas (hereinafter "Douglas") was hired into Maiatico's position.

16.     In addition, in May of 2025, Duarte separated from his employment and Robert Geren (hereinafter "Geren") was hired into Duarte's role in or about August of 2025.

17.     In or about June of 2025, Defendant also created a new position, titled  "Program Manager –  Supply Chain QA" that fell between QA Senior Supervisor and Senior Manager of QA.

18.     Kirstin Collins (hereinafter "Collins") was hired for the role of Program Manager – Supply Chain QA.

19.     Therefore, at the time of Plaintiff's separation from Defendant in October of 2025 (discussed further *supra*), her reporting structure was as follows: Plaintiff → Geren → Collins → Douglas → Wilson.

**<u>Plaintiff's Employment History as an SQF Practitioner</u>**

20.     In her role as SQF Practitioner, Plaintiff was responsible for achieving a SQF Certification and maintaining said Certification once it was achieved.

21.     Prior to Plaintiff's hire, Defendant had been attempting for approximately fourteen (14) years to achieve an SQF Certification (and Plaintiff was told the same by Defendant's prior management).

22.     With her skills, qualifications, hard work, and dedication, Plaintiff was able to achieve this within approximately 2 years of her hire, and Defendant was awarded the SQF Certification in October of 2023.

23.     In addition to achieving and maintaining the SQF Certification, Plaintiff was also responsible for various Quality Assurance ("QA") duties, including but not limited to food safety plan reviews, walk throughs of various facilities, supplier document reviews, corrective action reviews, and handling day-to-day quality issues or concerns (among other duties).

24.     While Duarte was the QA Senior Supervisor, Plaintiff handled a large portion of his job responsibilities.

25.    Throughout Plaintiff's employment with Defendant, she was a very hard-working employee, who performed her job well and was not subjected to any discipline (for performance or otherwise).

26.    In fact, in 2022 and 2023, Plaintiff received a rating of "Exceeds Expectations" on her annual performance reviews.

27.    In 2023, Plaintiff also earned the Wings of Excellence Award, which is a very prestigious award within Defendant, and only a handful of corporate employees receive this recognition each year.

28.    In 2024, Plaintiff received a "Meets Expectations" on her annual performance review; however, she was told by Duarte that he would have given her an "Exceeds Expectations," but he was only allowed to give one person in the department an "Exceeds Expectations" each year, and he did not think that it would be fair to give it to Plaintiff three (3) years in a row, which Plaintiff found to be incredibly unfair and expressed concerns about this to Defendant's management at the time.

29.    Despite Plaintiff's expressed concerns regarding Duarte's reasoning for giving her a "Meets Expectations" on her 2024 performance review, her rating remained the same.

30.    Regardless of her 2024 performance rating, Plaintiff continued to have a stellar work history throughout the remainder of her employment with Defendant, until she was unlawfully terminated in October of 2025.

**Plaintiff's Pregnancy Disclosure**

31.    In or about October of 2024, Plaintiff learned that she was pregnant and informed her direct management.

32.     Plaintiff thereafter announced that she was pregnant to her entire department in January of 2025 during a department meeting.

33.     This was Plaintiff's second pregnancy while employed with Defendant, as she had another child in April of 2023.

34.     Plaintiff had no issues surrounding her pregnancy or return to work following maternity leave in April of 2023; however, her experience with her second pregnancy was not the same.

35.     As stated previously, during the course of Plaintiff's pregnancy, Maiatico retired and Duarte separated from Defendant.

36.     Therefore, Plaintiff's reporting structure was not the same during her second pregnancy as it was during her first pregnancy.

37.     Before going on maternity leave, Douglass was hired to replace Maiatico.

38.     Douglas was aware of Plaintiff's pregnancy, as Douglass was in the January 2025 meeting when Plaintiff announced it to her department (discussed *supra*).

39.     After Douglass was hired to replace Maiatico, Plaintiff began to experience discrimination because of her pregnancy, her need for pregnancy-related accommodations (discussed *infra*), and her upcoming maternity leave, through denial of promotions, changes to her work schedule, intimidation, removal of job duties, and overall condescending and demeaning treatment by Defendant's management.

### Denial of Promotions

40.     After Maiatico announced his retirement (discussed *supra*), his position was posted ***internally*** (with additional job duties involving supply chain).

41.     Plaintiff applied for Maiatico's position in or about March of 2025.

42.     While Plaintiff understood there were others more qualified than her who also applied for Maiatico's position, she still applied to show Defendant's upper management, including Wilson, that she was interested in advancing her career within Defendant.

43.     Plaintiff does not contend that she was unlawfully denied this position, as Douglas, who was hired for the position, was more qualified to perform in this role.

44.     Plaintiff simply references this for context and to evidence that Defendant's management knew since March of 2025 that she was interested in advancing her career within Defendant.

45.     In addition to Maiatico's position, Plaintiff also applied for the position of Program Manager – Supply Chain QA, which was posted ***internally*** in May of 2025.

46.     Plaintiff was also not selected for this position, and Defendant hired Collins for this role.

47.     Collins was, and upon information and belief is still, located in Florida.

48.     However, the majority of Defendant's supply chain is in the Mid-Atlantic (where Plaintiff worked).

49.     Therefore, it did not make sense for Defendant to hire someone who was located in Florida, when the majority of the work that the Program Manager – Supply Chain QA would oversee was taking place in the facility at which Plaintiff worked and in the New Jersey Distribution Center (which Plaintiff lived closer to as well).

50.     Even though Plaintiff was not selected for this role, it still gave her the opportunity to show Wilson and Douglas that she was interested in advancing her career within Defendant.

51.     The promotion for which Plaintiff strongly believes she was wrongfully denied was that of QA Senior Supervisor.

52.     After Duarte separated from his employment in May of 2025, Plaintiff was contacted by Douglas on May 23, 2025.

53.     During her May 23, 2025 conversation with Douglas, Douglas told Plaintiff that Duarte was no longer employed with Defendant, and she immediately responded that she was interested in being promoted to his position.

54.     Plaintiff had been performing numerous aspects of the QA Senior Supervisor position for several years and had been stepping up in areas where Duarte's performance had been lacking.

55.     Plaintiff was more than qualified for the QA Senior Supervisor position.

56.     In response to expressing her interest in being promoted into Duarte's role, Douglas dismissed Plaintiff and simply stated: "We need to do what is best for the facility right now."

57.     Plaintiff was approximately eight (8) months pregnant during this conversation and was about to go on maternity leave within the next approximate month.

58.     Therefore, Douglas was clearly referring to Plaintiff's pregnancy and her upcoming absence from work related to the same (*i.e.* Plaintiff's maternity leave) when stating: "We need to do what is best for the facility right now."

59.     Following Plaintiff's discussion with Douglas on May 23, 2025, the QA Senior Supervisor position was posted and made open to external candidates.

60.     This was the ***only*** position out of the three aforesaid positions that was posted for external candidates to apply.

61.     When Plaintiff inquired as to why this position was posted externally and not kept internal like the other two, she was informed that it was because Defendant's management did not know that anyone internally was interested in the role (despite that Plaintiff had shown and informed Wilson that she was very interested in advancing her career within Defendant and that she had very clearly informed Douglas on May 23rd that she wanted to be promoted to the QA Senior Supervisor position).

62.     Regardless of Defendant's clear attempt to dissuade Plaintiff from applying for the QA Senior Supervisor position, she still submitted her application for the same.

63.     During Plaintiff's interview, it was discussed that she would be on maternity leave for 15 weeks starting in late June or early July (whenever she gave birth), but that she was willing to put in the work and by the time they hired someone else and got that person acclimated to the facility, she would be ready to return.

64.     Plaintiff advocated that no one hired externally would be fully integrated with the facility the same way as she was before she returned from maternity leave.

65.     Despite explaining why she believed she was best fit for the position and that her maternity leave would have no impact on her ability to perform within the QA Senior Supervisor role, Plaintiff did not even make it past the first round of interviews.

66.     On July 2, 2025, Plaintiff commenced maternity leave.

67.     On July 17, 2025, Plaintiff was notified by Collins during a phone call that she was not selected for the second round of interviews for the QA Senior Supervisor position and that they were moving forward to the second round of interviews with two external candidates.

68.     Collins notified Plaintiff via telephone that she was not selected for the QA Senior Supervisor position because she did not have enough leadership experience for the job.

9

69.    Prior to Plaintiff's employment with Defendant, she had almost 10 years of leadership/managerial experience (the majority of which was with QA), and she had been employed with Defendant performing QA Senior Supervisor duties since she started in 2021 (because Duarte lacked performance in several aspects of his job).

70.    However, instead of hiring Plaintiff for the QA Senior Supervisor position, Defendant hired an external candidate, who was not at all familiar with Defendant's operations.

## Changes in Work Schedule

71.    Since in or about 2021, Plaintiff had been working from home every Friday.

72.    This was a schedule that was not only permitted by Maiatico and Duarte but was also pretty standard amongst Defendant's Corporate Employees.

73.    However, on or about May 23, 2025, Douglas notified Plaintiff that she should not be working from home on Fridays and that when she returned from maternity leave, she would not be permitted to work from home on Fridays (unless she was sick or had a doctor's appointment).

74.    Plaintiff was told that because she worked for a manufacturing facility, her presence was needed 5 days a week between the hours of 9 a.m. and 5 p.m. (even though the manufacturing facility operates 24/7).

75.    However, Plaintiff never had any issues operating in her role and performing her job duties effectively, despite working from home every Friday for the last approximate four (4) years.

76.    Regardless, Plaintiff did not argue with Douglas; however, she did notify her that during her last pregnancy, she was permitted to work entirely from home during the last month of her pregnancy, as there were multiple issues with the facility which made it difficult for her to

work at the office during her last month of pregnancy (in addition to the fact that she had precipitous labor with her last pregnancy and was anticipated to have it with her second pregnancy as well).

77.     Douglas responded that if she needed this accommodation again, she would be requested to submit a doctor's note supporting the same.

78.     As instructed, Plaintiff provided a doctor's note supporting the accommodation of remote work during the final weeks of her pregnancy; however, this requested accommodation took approximately two weeks to get approved, as the individual assigned to Plaintiff's accommodation request was on PTO.

79.     Therefore, Plaintiff had to contact various individuals to speed up the evaluation process and asked Wilson for help in getting the accommodation assessed as soon as possible, due to the fact that she was already within a month of her due date.

80.     Plaintiff's accommodation was eventually granted, and she was permitted to work from home under her accommodation starting on or about June 16, 2025.

81.     From June 16, 2025 until July 1, 2025, Plaintiff worked remotely (with the exception of June 23rd and June 24th for which she took PTO) and continued to perform her job effectively.

82.     On July 2, 2025, Plaintiff gave birth to her child and started maternity leave.

83.     While on maternity leave, Defendant continued to reiterate its new requirement that Plaintiff work five (5) days in the office when she returned from maternity leave.

84.     Even after Plaintiff returned from maternity leave, Defendant's management, including Collins and Geren, continued to reiterate the in-office work requirement.

11

85.     Plaintiff thought Defendant's management's behavior was extremely odd, and it seemed as if they were obsessively echoing the in-office work requirement to her because they thought she would be unreliable with a newborn at home or because they wanted her to quit (and thought she would) due to not being able to work remotely.

86.     Tellingly, there were other individuals within Plaintiff's department that were not required to be in the office 5 days a week from 9 a.m. – 5 p.m.

**Intimidation Tactics During Maternity Leave**

87.     Plaintiff was scheduled to take 15 weeks of maternity leave, which was offered by Defendant.

88.     The SQF Certification audit occurs every year; however, every three years the audit is unannounced.

89.     2025 was the year that the SQF Certification audit was unannounced.

90.     However, Defendant was given a window of when the SQF Certification audit will happen.

91.     Because Plaintiff was taking 15 weeks of maternity leave, instead of 12 weeks, the aforesaid audit window more aggressively overlapped with her leave, meaning that there was a higher chance the audit could happen while she was on maternity leave.

92.     When Collins discovered through Plaintiff's colleague that Plaintiff was taking 15 weeks of maternity leave (and not 12), she reached out to Plaintiff (while she was still on maternity leave) and suggested that she did not have to take all of her leave right now and insinuated that she should come back to work until the audit period was over and then go back out on leave. Collins also stated during this conversation: "it could be nice to take [leave] during the holidays."

12

93. Collins indicated to Plaintiff that she would reach out to Human Resources ("HR") to work out the logistics of this arraignment.

94. However, shortly after her aforesaid conversation with Collins, Plaintiff received an email from HR stating that she did not have to break up her leave, and that if the SQF Certification audit happened without her, Plaintiff's department would have to handle it.

95. Because Plaintiff was now fearful that being on maternity leave when the audit happened would negatively impact her job, she talked to Collins again and offered to come back for a week if the auditor showed up while she was still on maternity leave.

96. Collins declined Plaintiff's aforesaid offer and told her to just return following the conclusion of her originally scheduled maternity leave.

**Retaliation/Discrimination Upon Returning from Maternity Leave**

97. Plaintiff returned to work from maternity leave on or about October 15, 2025.

98. Upon returning from maternity leave, Plaintiff was met with increased hostility.

99. For example, Plaintiff noticed that her job duties were gradually being stripped from her and assigned to other individuals, and she was given the cold shoulder by Defendant's management (as if she had done something to upset them) – specifically Douglas.

100. In fact, on the first day that Plaintiff returned to work from maternity leave, Collins notified Plaintiff that she was removing her from the audit, that she was to let Geren lead the audit, and that she needed to reiterate that Plaintiff was required to work in the office 5 days a week.

101. The stripping of Plaintiff's job duties started even before she went on maternity leave; however, it was framed to Plaintiff by Defendant's management, including Douglas, that

13

everyone in the department needed to work as a team and that Plaintiff should not bear the burden of handling everything herself.

102. Plaintiff later realized that Defendant was gradually pushing her out and wanted to train others on her job duties before they officially terminated her employment.

103. Despite Defendant's clear animosity towards Plaintiff for discriminatory and retaliatory reasons, she continued to perform her job effectively.

### Plaintiff's Termination

104. On or about October 13, 2025 (while Plaintiff was still on maternity leave), Wilson rescheduled a recurring 1:1 meeting for October 27, 2025, stating that she was already going to be on campus that day for another meeting and therefore, she and Plaintiff could meet in person.

105. When Plaintiff entered the meeting, Douglas and another woman from Defendant's HR was also present.

106. Plaintiff was told during this meeting that Defendant was cutting its budget and that her job was being eliminated effective October 31, 2025.

107. Upon information and belief, Plaintiff was the only person eliminated due to Defendant's alleged budget cuts at this time.

108. Knowing this would likely be an issue, Defendant claimed in its position statement to the Equal Employment Opportunity Commission that Geren seemingly made the decision to eliminate Plaintiff's position after he learned that her position wasn't necessary (versus that her job was eliminated due to budget cuts as she was initially told).

109. However, Plaintiff was informed that Geren was not even aware of her termination until after she was fired and that he has also implied that he was not pleased with

Plaintiff's termination because he accepted the position of QA Senior Supervisor believing that he would have two (2) direct reports and then abruptly lost one soon after he was hired.

110. Plaintiff was thereafter offered a severance which required her to waive any and all claims she has against Defendant, including claims under the Pregnancy Discrimination Act, the FMLA, and the Pregnant Workers' Fairness Act.

111. Plaintiff did not sign this agreement because she was unlawfully terminated in violation of the aforesaid statutes.

112. It is clear that Defendant did everything it could to push Plaintiff out of her employment with Defendant for discriminatory and retaliatory reasons, including: (1) opening up the QA Senior Supervisor position to external candidates (instead of keeping it an internal job posting like it did for the prior two positions that were posted in 2025); (2) hiring an external candidate in favor of Plaintiff (to keep her from working for Defendant following her maternity leave); (3) stripping Plaintiff of her job duties; (4) changing Plaintiff's work schedule; and (5) subjecting Plaintiff to hostility and animosity (all in an effort to make Plaintiff quit).

113. When Plaintiff returned from maternity leave, she continued to try to press forward, despite Defendant's clear discriminatory and retaliatory tactics; however, Defendant ultimately made the decision to abruptly terminate her for clearly pretextual and shifting reasons and in violation of federal and state law.

**First Cause of Action**
**<u>Violations of Title VII/PDA</u>**
**(Pregnancy Discrimination – [1] Hostile Work Environment; [2] Failure to Promotion; & [3] Unlawful Termination)**

114. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

115.    Plaintiff is qualified under the Title VII/PDA for protection because she was pregnant.

116.    Plaintiff was subjected to a hostile work environment through disparate treatment, denial of promotions, intimidating and hostile behavior, changing her work schedule, removing her job duties and ultimately terminating her employment because of her pregnancy.

117.    Plaintiff's pregnancy was a motivating or determinative factor in Defendant's decisions to (1) deny her promotions; and (2) terminate her employment.

118.    Defendant's actions as aforesaid constitute violations of Title VII/PDA.

**Second Cause of Action**
**Violations of the PWFA**
**([1] Interference; [2] Discrimination/Retaliation; [4] Hostile Work Environment)**

119.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

120.    Plaintiff is qualified under the PWFA for protection because she was pregnant during her employment with Defendant and had requested the reasonable accommodations of working remotely for several weeks preceding the birth of her child and medical leave following the birth of her child (to recover from the same).

121.    Plaintiff was subjected to hostile work environment in response to inquiring about pregnancy-related accommodations and informing Defendant's management that she intended to utilize reasonable pregnancy-related accommodations.

122.    Plaintiff believes and therefore avers that she was retaliated against for requesting/utilizing reasonable pregnancy-related accommodations when she was denied promotional opportunities and ultimately terminated.

123.    Defendant's actions as aforesaid constitute violations of the PWFA.

**Third Cause of Action**
**Violations of the Family and Medical Leave Act ("FMLA")**
**(Interference and Retaliation)**

124.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

125.    Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

126.    Plaintiff requested leave from Defendant, her employer, with whom she had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

127.    Plaintiff had at least 1,250 hours of service with the Defendant during her last full year of employment.

128.    Defendant is engaged in an industry affecting commerce and employ fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

129.    Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on a block or intermittent basis.

130.    Defendant committed interference and retaliation violations of the FMLA by *inter alia*: (1) refusing to promote Plaintiff and/or terminating Plaintiff for requesting and/or exercising her FMLA rights; (2) taking actions towards her that would dissuade a reasonable person from exercising her rights under the FMLA (such as failing to promote her, subjecting her to a hostile work environment, and suggesting she come back early from leave); and/or (3) considering Plaintiff's FMLA leave needs in making the decision to terminate her.

131.    These actions as aforesaid constitute violations of the FMLA.

17

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.      Defendant is to be prohibited from continuing to maintain its illegal policy, practice or custom of discriminating/retaliating against employees and is to be ordered to promulgate an effective policy against such unlawful acts and to adhere thereto;

B.      Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date she first suffered retaliation/discrimination at the hands of Defendant until the date of verdict;

C.      Plaintiff is to be awarded liquidated and/or punitive damages, as permitted by applicable law(s) alleged asserted herein, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.      Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate including for emotional distress;

E.      Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

F.      Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

G.      Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:

Ari R. Karpf, Esq. (91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
215-639-0801 (P)
215-639-4970 (F)
akarpf@karpf-law.com

Dated: March 20, 2026

19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

|  |  |  |
|---|---|---|
| Alison Vandermay | : | CIVIL ACTION |
| v. | : | |
| Wawa, Inc. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (x )

| | | |
|---|---|---|
| 3/20/2026 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction:  Defendants place of business

---

***RELATED CASE IF ANY:***   Case Number:_____  Judge:_____

1.  Does this case involve property included in an earlier numbered suit?                              Yes ☐

2.  Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?   Yes ☐

3.  Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?  Yes ☐

4.  Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same   Yes ☐
    individual?

5.  Is this case related to an earlier numbered suit even though none of the above categories apply?    Yes ☐
    If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A.   *Federal Question Cases:***

☐ 1.  Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2.  FELA
☐ 3.  Jones Act-Personal Injury
☐ 4.  Antitrust
☐ 5.  Wage and Hour Class Action/Collective Action
☐ 6.  Patent
☐ 7.  Copyright/Trademark
☐ 8.  Employment
☐ 9.  Labor-Management Relations
☒ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief  *see certification below*
☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

**B.   *Diversity Jurisdiction Cases:***

☐ 1.  Insurance Contract and Other Contracts
☐ 2.  Airplane Personal Injury
☐ 3.  Assault, Defamation
☐ 4.  Marine Personal Injury
☐ 5.  Motor Vehicle Personal Injury
☐ 6.  Other Personal Injury *(Please specify)*:_____
☐ 7.  Products Liability
☐ 8.  All Other Diversity Cases:  *(Please specify)*_____
       _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
VANDERMAY, ALISON

**(b)** County of Residence of First Listed Plaintiff  Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

## DEFENDANTS
WAWA, INC.

County of Residence of First Listed Defendant  Delaware
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | |
| ☒ 3 | Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 | U.S. Government Defendant | |
| ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** ☐ 365 Personal Injury - Product Liability ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 840 Trademark ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud ☐ 371 Truth in Lending | **LABOR** ☐ 710 Fair Labor Standards Act | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | **SOCIAL SECURITY** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 861 HIA (1395ff) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 864 SSID Title XVI | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 865 RSI (405(g)) | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | **FEDERAL TAX SUITS** | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS—Third Party 26 USC 7609 | |
| | | **IMMIGRATION** ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
TITLE VII (42USC2000); FMLA (29USC2601)

Brief description of cause:
Violations of Title VII/PDA, PWFA, FMLA and the PHRA.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE  3/20/2026

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____